**MONARCH GREENBACK, LLC,
an Idaho limited liability
company, Plaintiff,**

v.

**MONTICELLO INSURANCE
COMPANY, a Delaware
corporation, Defendant.**

**No. CV98–320–S–EJL.**

United States District Court,
D. Idaho.

Nov. 29, 1999.

Gary D Babbitt, Albert P Barker, Richard Burleigh, Hawley Troxell Ennis & Hawley, Boise, ID.

Donald J. Farley, Jenny B. Carey, Hall Farley Oberrecht & Blanton, Boise, ID.

Randall E. Phillips, Donald Parthum, Donald Parthum Jr., Provizer & Phillips, Southfield, MI.

## MEMORANDUM DECISION
## AND ORDER

LODGE, District Judge.

Pending before the Court in the above entitled matter are the Plaintiff's Motion for Partial Summary Judgment (Docket No. 18), Defendant's Motion for Summary

Judgment (Docket No. 23), and Plaintiff's Motion for Extension of Time Pursuant to Rule 56(f) (Docket No. 33). Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument. D. Id. L. Civ. R. 7.1.

## I. FACTUAL BACKGROUND

Plaintiff, Monarch Greenback, LLC ("Monarch"), owns approximately 110 acres near Atlanta, Idaho ("the Atlanta site"). Mining and milling operations occurred at the site from roughly the 1930s until the 1950s. Tailings [1] from the mining and milling operations were deposited into two main impoundments located on the site: the upper tailings impoundment and the lower tailings impoundment.

In 1996, Monarch purchased from Monticello Insurance Company ("Monticello") an insurance policy providing certain general liability insurance for the Atlanta site ("the policy"). The policy was renewed to provide coverage effective for the period of March 16, 1997 to March 16, 1998 and the record indicates that Monarch made the requisite premium payments under the policy. The policy provided coverage, subject to its terms, conditions and exclusions, for "property damage" ("Coverage A") occurring on the Atlanta site and within the policy period, and for "personal injury" ("Coverage B") arising out of Monarch's business if the offense occurs on the Atlanta site and within the policy period. The policy also provides that Monticello had the right and duty to defend any "suit"

seeking damages covered under either Coverages A or B.

On May 15, 1997, a structural failure occurred in the upper tailings impoundment resulting in the release of a large volume of tailings into and over the lower tailings impoundment ("the 1997 occurrence"). The tailings flowed downhill onto land owned by the United States Forest Service ("USFS"), Green Tree, Inc. ("Green Tree"), and into Montezuma Creek and the Middle Fork of the Boise River, which is owned by the State of Idaho.

The 1997 occurrence prompted Terracon Consultants Western, Inc. ("Terracon") [2], the USFS, the Idaho Division of Environmental Quality ("DEQ"), the Idaho Department of Water Resources, the United States Environmental Protection Agency ("EPA"), and the Army Corp of Engineers to begin investigating the effects of the released tailings on the environment. Water and soil samples collected during the investigation indicated the existence of several contaminants of concern. [3] Of these, arsenic is the contaminant of primary concern.

On May 28, 1997, Green Tree sent a letter to Monarch demanding that Monarch cover all costs and expenses incurred by Green Tree to return its land back to the condition it was in prior to the 1997 occurrence. Green Tree also stated that it expected to be compensated for damages to its property and the potential economic gains it was expecting with development of the property.

On or about June 4, 1997, Monarch notified its insurance agent, Christensen and Associates, of the 1997 occurrence in order to tender the insurance company's defense

---

1. Tailings are "residue separated in the preparation of various products (as grain or ores)." The tailings in this case are the by-products of gold mining and are composed of sand, silt and clay and contain traces of the metals arsenic, antimony, iron, mercury and zinc. Webster's Ninth New Collegiate Dictionary 1202 (9th ed.1991).

2. Terracon was retained by Monarch to stabilize the tailings impoundments and to develop work plans to be submitted to the Idaho Division of Environmental Quality.

3. The contaminants of concern include the following metals: arsenic, antimony, iron, mercury, and zinc.

as to Green Tree's claims and as to any future claims asserted by the United States and/or the State of Idaho. Christensen and Associates subsequently notified Monticello. On July 11, 1997, Monticello acknowledged receipt of Monarch's claim, identified a number of coverage issues, and stated that it intended to investigate the matter under a full reservation of policy rights.

Monarch entered into a Consent Order with the DEQ on July 11, 1997. The order laid out the obligations and responsibilities of Monarch with respect to investigating and interim and final remediation at the site.

On or about July 21, 1997 Monticello requested information, documents or records from Monarch to assist with Monticello's investigation. On August 11, 1997 Monarch provided several documents and written responses.

On August 6, 1997, the EPA issued an Administrative Order pursuant to Section 104(e) of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9604(e), as amended ("CERCLA"). The Order provided employees and representatives of the EPA and the State of Idaho with access to the site in order to effectuate response actions under CERCLA.

Monarch agreed to an Administrative Order of Consent for a Removal Action with the USFS on October 16, 1997. The Order was given in coordination with and consistent to the Consent Order Monarch entered into with the State of Idaho on July 11, 1997. The Order further provided that the USFS be reimbursed for certain costs.

On or about October 20, 1997 Monticello denied coverage claiming that it did not have any obligation to defend or indemnify Monarch for the claims by Green Tree and the Government. Monticello's denial was based on two assertions: (1) that Monarch's claims failed to fall within the policy's definition of "suit;" and (2) that the policy's pollution exclusion applied to all Monarch's claims.

In response to Monticello's letter, by written correspondence dated December 12, 1997, Monarch explained its disagreement with Monticello's decision and again demanded that Monticello provide the necessary funds to cover the defense of the claims against Monarch. On March 4, 1998, Monticello reconfirmed its decision to deny coverage to Monarch.

On June 18, 1998, the EPA issued a Unilateral Administrative Order for Removal Response Activities pursuant to Section 106(a) of CERCLA. The Order directed Monarch to undertake and complete removal actions described within it to abate the endangerment to public health and the environment as a result of the 1997 occurrence. Monarch forwarded the Order to Monticello on the following day and again requested a defense and indemnification for the claims asserted against them. On June 30, 1998, Monarch also forwarded a second Green Tree letter demanding remedies for alleged property damages. Monarch again requested Monticello's aid in defending the numerous claims.

On July 6, 1998, this action was filed in the District Court of the Fourth Judicial District for the County of Elmore, State of Idaho. On August 6, 1998, Monticello removed the matter to this Court pursuant to 28 U.S.C. § 1441.

On or about July 30, 1998, the U.S. Department of Justice ("DOJ"), at the request of the EPA, notified Monarch of its intent to bring a federal court action against Monarch for violations of sections 301 and 309 of the Clean Water Act, 33 U.S.C. § 1311 et. seq. The DOJ stated that the complaint would allege that Monarch did violate and continues to violate the Clean Water Act by discharging pollutants from a point source without a permit. The DOJ also warned that the complaint would seek injunctive relief and civil penalties. However, before filing the complaint, the DOJ extended Monarch the opportunity to discuss settlement of the violations. On August 5, 1998, Monarch informed

Monticello of the DOJ's threat and requested Monticello's assistance. Monticello again denied assistance for the same reasons it denied coverage previously.

On September 22, 1998, Monarch filed suit against Doe Run Resource Corp.[4] ("Doe Run") and Green Tree in the United States District Court, District of Idaho, for contribution to offset Monarch's damages in the federal and state actions. *Monarch Greenback, LLC v. Doe Run Resource Corp; Green Tree, Inc.,* CIV–98–0354–S–MHW. Both Doe Run and Green Tree responded to Monarch's suit by filing counterclaims for CERCLA damages. Monarch forwarded the counterclaims to Monticello and tendered its defense as to both of them. On November 17, 1998, Monticello refused to defend Monarch against the Doe Run and Green Tree claims.

Finally, on February 4, 1999, Monarch entered into an Administrative Order of Consent with the EPA concerning CERCLA damages caused by the 1997 occurrence.

## II. STANDARD OF REVIEW

III. Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, the evidence must be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hughes v. U.S.,* 953 F.2d 531, 541 (9th Cir.1992).

The Supreme Court has made it clear that under Rule 56, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets that burden, summary judgment will be mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See id.* If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.[5]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." Fed.R.Civ.P. 56(c). An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (*quoting First Nat. Bank v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The

---

4. Doe Run is the successor to entities that allegedly built both the upper and lower tailing impoundments and/or deposited material in the impoundments.

5. *See also,* Rule 56(e) which provides, in part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Ninth Circuit, in line with this standard, found in order to withstand a motion for summary judgment, a party

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371, 374 (9th Cir.1989) (*citation omitted*).

## III. ANALYSIS

This matter was removed to federal court by Monticello based upon the diversity of the parties. When sitting in diversity cases we apply state substantive law as "declared by [the state's] legislature in a statute or by its highest court." *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, Idaho state insurance law controls the substantive issues before this Court.

### A. Duty to Defend

This case is essentially one of semantics. Like most contract cases, it revolves around the definition of particular words and whether those words prove to be ambiguous. Similar to much of the case law dealing with the duty to defend, the case at bar is centered on whether a "suit" exists as defined in the policy. Unlike most of the case law on this topic, the policy in this case has defined the word "suit". However, instead of clarifying matters, the definition has caused confusion between the parties and has led to this dispute.

In determining whether Monticello had a duty to defend, the Court must determine whether a "suit," as defined in the policy, existed. In determining whether a suit existed, the Court must determine: (1) whether the claims against Monarch constituted "civil proceedings;" (2) whether the damage arising out of the 1997 occurrence falls within the policy's coverage; and (3) whether the policy's pollution exclusion applies, thus denying Monarch any coverage. These questions will be answered in the following analysis.[6]

In *Nedrow v. Unigard Sec. Ins. Co.,* 132 Idaho 421, 974 P.2d 67 (1998), the Idaho Supreme Court summarized the legal canons of construction for insurance contracts:

With contracts of insurance, this Court has adopted certain canons of construction that guide our ultimate resolution of a conflict. As a contract of adhesion, not typically subject to negotiation between the parties, an ambiguity must be construed most strongly against the insurer. Where the policy language is clear and unambiguous, however, coverage must be determined in accordance with the plain meaning of the words used. When confronted with ambiguous language in an insurance contract, we must determine what a reasonable person would have understood the language to mean. The words used in the insurance policy must then be construed in their ordinary meaning. Ambiguity exists only if a policy term is reasonably subject to conflicting interpretation.

(*internal citations omitted*).

### 1. A Civil Proceeding

The policy states that "[Monticello] will have the right and duty to defend any 'suit' seeking those damages."[7] "Suit" is defined in the policy as:

---

6. The materials enumerated in the statement of facts have been submitted to establish that there are no material facts in dispute, and that the Court can declare, as a matter of law, whether Monticello owed Monarch a duty to defend.

7. "those damages" refers to damages covered under both Coverage A (Bodily Injury and Property Damage Liability) and Coverage B (Personal and Advertising Injury Liability) of the policy.

a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which you must submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

Docket No. 21 Ex. A. at MG005631.

Monticello asserts that their duty to defend has not been triggered because there has been no civil proceeding filed in a court of law.[8] Although their assertion is supported by several Idaho district court decisions,[9] as well as the United States Supreme Court's decision in *Kohl v. U.S.*, 91 U.S. 367, 1 Otto 367, 23 L.Ed. 449 (1875), the case at bar is distinguishable because here the policy at issue contained a definition of "suit." Accordingly, despite Monticello's argument, this Court must use the definition provided in the policy to determine what the parties understood the definition of "suit" to include.

If the language in a contract is unambiguous, it will be enforced according to its single plain meaning. *See Mutual of Enumclaw*, 128 Idaho at 235, 912 P.2d at 122. If, on the other hand, the language is ambiguous, the court must resolve the ambiguity against the party who prepared the contract. *See id.* Likewise, insurance policies are to be construed most liberally in favor of recovery, with all ambiguities being resolved in favor of the insured. *See North Pacific Insurance Co.*

*v. Mai*, 1995 WL 854735 (D.Idaho 1995), *aff'd on other grounds, North Pacific Ins. Co. v. Mai*, 130 Idaho 251, 939 P.2d 570 (1997). "Where language may be given two meanings, one of which permits recovery and the other does not, it is to be given the construction most favorable to the insured." *Id.* A contract provision is ambiguous if it is reasonably subject to conflicting interpretation. *See Walker v. American Cyanamid Company*, 130 Idaho 824, 948 P.2d 1123, 1130 (1997). Under Idaho law, whether the language of an insurance policy is ambiguous is a question of law for the trial judge. *See Foster v. Johnstone*, 107 Idaho 61, 63, 685 P.2d 802, 804 (1984).

According to the policy at issue, in order for a "suit" to exist, there must first be a civil proceeding. Monticello contends that a civil proceeding is one that is filed in a court of law; however, the policy does not specifically require it and the Court has found no case law supporting such an assertion. Accordingly, because the term "civil proceeding" is not defined in the policy, and because it is reasonably subject to conflicting interpretation, the Court finds that the term "civil proceeding" is ambiguous and will be construed using its ordinary meaning, in a light most favorable to the insured.

In defining the term "civil proceeding," the Court notes that the term is not defined in any dictionaries it reviewed. However, when viewing the definition of the words "civil" and "proceeding," it becomes clear that a "civil proceeding" not only refers to an action filed in court, but includes other non-criminal proceedings conducted by a court, or by persons authorized by the law to do so.[10] This construc-

---

8. Monticello acknowledges that the counterclaims filed by Doe Run and Green Tree are civil proceedings, but assert the pollution exclusion found in the Policy applies to those suits and does not trigger the duty to defend.

9. *See Republic Ins. Co. v. Sunshine Mining Co.*, Nos. 95229 and 95239 (D. Id. Ada County Ct. April 27, 1993) Docket No. 26 Ex. 24; *Hecla Mining Co. v. Continental Ins.*, No. CV–91–87608 (D. Id. Kootenai County Ct. March 19, 1993) Docket No. 26 at Ex. 25; *City of*

*Pocatello v. Colonial Penn Ins. Co.*, No. CV–41790–B (D. Id. Bannock County Ct. July 1, 1996) Docket No. 26 at Ex. 29.

10. The word "civil is defined as relating to private rights and remedies sought by civil actions as contrasted with criminal proceedings." Black's Law Dictionary 244 (6th ed.1990). "Civil" is "distinguished from criminal." The Compact Oxford English Dictionary 262 (2nd ed.1991).

tion is consistent with the policy's definition of "suit" which specifically includes "arbitration proceedings" and "any other alternative dispute resolution proceedings." "Suit" is defined as a "civil proceeding," and specifically includes procedures for settling disputes by means other than litigation. If Monticello wanted a suit to be limited to one filed in a court of law, they should have specifically stated it.[11]

Monarch argues, *inter alia*, that all correspondences sent to them alleging damage responsibility resulting from the 1997 occurrence constituted civil proceedings. According to the record, five different parties have alleged damages against Monarch.[12] Monarch's assertion is that the correspondences from each of the five triggered a duty to defend on behalf of Monticello as to that particular party. The question of whether a correspondence falls into the policy's definition of "suit" is a matter· of law for the Court to decide. Thus, it is necessary to examine Monarch's relationship with each of the five parties claiming damages against Monarch.

Where there is ambiguity, as with the definition of "suit," "the test is what a reasonable person in the position of the insured would have understood the language of the contract to mean."[13] *City of Boise v. Planet Insurance Co.*, 126 Idaho 51, 55, 878 P.2d 750, 754 (1994). This test is known as the "doctrine of probability or reasonableness and has long been geared toward ascertaining intent in situations of ambiguity." *Thompson v. St. Paul Fire & Marine Insurance Company*, 108 Idaho 802, 808, 702 P.2d 840, 846 (1985). The

test is an objective one and goes to what a reasonable person in the position of the insured would have understood the language of the contract to mean. *See Foremost Ins. Co. v. Putzier*, 102 Idaho 138, 142, 627 P.2d 317, 321 (1981).

#### a. Green Tree's Claims

■ On or about May 28, 1999, Monarch received a letter demanding that Monarch cover all of Green Tree's damages relating to the 1997 occurrence. Although Monarch could have reasonably determined that Green Tree might eventually file a suit for damages relating to the occurrence,[14] a demand letter from a private corporation does not fall into the policy's definition of "suit." Even using the most liberal construction of a "civil proceeding" favoring Monarch, a demand letter from a private organization does not meet the requirements of a civil proceeding. A demand letter does not qualify as a proceeding in front of a court, agency, tribunal, bureau, or someone authorized by the court to do so; accordingly, Green Tree's demand letter did not trigger Monticello's duty to defend.

#### · b. Administrative Proceedings

■ Next, the Court must determine whether the administrative proceedings initiated by the DEQ, USFS and EPA triggered Monticello's duty to defend. Monarch argues that the Ninth Circuit's decision in *Aetna Casualty and Surety Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir.1991) supports their contention that administrative proceedings are suits.

---

"Proceeding" is defined "[i]n a general sense as the form and manner of conducting juridical business before a court or judicial officer. *The term also refers to administrative proceedings before agencies, tribunals, bureaus, or the like.*" [emphasis added] Black's 1204.

**11.** For example, Monticello could have used the term "civil action" as opposed to a "civil proceeding."

**12.** The five parties that have alleged claims against Monarch are the following: DEQ, Doe Run, EPA, Green Tree, and USFS.

**13.** This test is used to aid in the construction of an ambiguous term in a contract and is not conclusive to determine the intent of the parties. The standard to which construction of an insurance contract applies is against the one who wrote it. *See Foremost Ins. Co. v. Putzier*, 102 Idaho 138, 142, 627 P.2d 317, 321 (1981).

**14.** The receipt of a demand letter often leads to the filing of a suit. *See Danz v. Lockhart*, 132 Idaho 113, 967 P.2d 1075 (1998); *see also Leasefirst v. Burns*, 131 Idaho 158, 953 P.2d 598 (1998).

While the Court agrees with Monticello that *Pintlar* is distinguishable from the case at bar in the sense that "suit" was not defined in the policy involved in *Pintlar*, the decision does provide persuasive dicta helpful in deciding this case.

In *Pintlar* the Ninth Circuit held that an administrative claim initiated by a potentially responsible party notice constituted a "suit" and triggered the insurer's duty to defend. *See id.* In that case, Pintlar received a potentially responsible party notice from the EPA as a result of Pintlar's violation of CERCLA. There the court stated:

> We hold that the EPA's administrative claims against the insured triggered insurers' duty to defend. Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation. A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements. It is in the nation's best interests to have hazardous waste cleaned up effectively and efficiently.

*Id.* at 1517 (*internal citations omitted*). The court found that "an 'ordinary person' would believe that the receipt of a potentially responsible party notice is the effective commencement of a 'suit' necessitating a legal defense." *Id.* Similar to *Pintlar*, the administrative proceedings that arose in this case had the potential to create a lawsuit in the eyes of an ordinary person.[15] If Monarch had not cooperated with the government agencies, a lawsuit would have surely followed.[16]

Not only have administrative proceedings been found to be suits where suit is undefined in the policy, but an administrative proceeding fits squarely into the Court's construction of a "civil proceeding," thus satisfying the first prong of a "suit" according to the policy. Accordingly, the Court finds, as a matter of law, the administrative proceedings initiated by DEQ, USFS and EPA constituted "civil proceedings."

**c. Doe Run and Green Tree Lawsuits**

Currently pending before Judge Williams in another matter is Monarch's lawsuit against Doe Run and Green Tree. Both Doe Run and Green Tree responded to Monarch's suit by filing counterclaims for CERCLA damages. There is no dispute that the counterclaims are "civil proceedings" and satisfy the first prong of the definition of "suit".

**2. Coverage**

The second prong of the "suit" definition requires that the civil proceeding must allege damages that are covered under the policy.

Under Coverage A of the policy, Monticello agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of ... property damage." "Property damage" is defined as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that cause it; or

b. Loss of use of tangible property that is not physically injured. All such

---

15. Although Monticello has argued that the Ninth Circuit incorrectly applied the purely subjective doctrine of reasonable expectations to its decision in *Pintlar*, this Courts finds that Monticello's argument is without merit. In *Pintlar*, the Ninth Circuit correctly applied the doctrine of probability or reasonableness, focusing on what an "ordinary person" would believe and not what the specific insured thought. *See id.* 948 F.2d at 1516–17.

16. The DEQ Consent Order stated that the "failure [of Monarch] to comply with the terms of this Consent Order may result in a district court action." Docket No. 22 Ex. 4 at 19. The EPA Administrative Order to Secure Access stated that, "[s]hould [Monarch] violate this Order or any portion hereof, EPA may seek judicial enforcement" *Id.* Ex. 6 at 11. Finally, the USFS Administrative Order on Consent for a Removal Action stated that if Monarch violated the aforementioned Order the "United States reserves the right to take any enforcement action pursuant to CERCLA or any other legal authority for relief." *Id.* Ex. 8 at 33.

loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

Docket No. 21 Ex. A. at MG005631.

Coverage B reads, Monticello "will pay those sums that the insured becomes legally obligated to pay as damages because of personal injury ... to which this insurance applies." In pertinent part, "personal injury" is defined as:

> [an] injury, other than 'bodily injury', arising out of one or more of the following offenses:
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

Docket No. 21 Ex. A. at MG005630.

■ While it is undisputed that property damage resulted from the occurrence, it is disputed whether a personal injury, as defined in the policy, existed. In analyzing whether subsection (c) of Coverage B applies, it is first necessary to determine if the definition of "personal injury" is ambiguous by using the same rules laid out in the "civil proceeding" analysis.

In *Goodman Oil Co. v. Federated Service Ins. Co.*, No. 95–0209–S–BLW (D. Id. April 26, 1996),[17] the court was confronted with a similar issue of whether the policy definition of 'personal injury' was ambiguous. In *Goodman*, a leaking oil tank, owned by the insured, damaged a nearby store. The insured argued, as Monarch does presently, that subsection (c) of the 'personal injury' definition, identical to the definition in the policy, provided coverage against the store's claim of trespass because the term "by or on behalf" modifies the person who occupies the premises. Monarch further argues that because the term could also be used to modify the person committing the wrong, an ambiguity exists and the term should be construed against Monticello. The court in *Goodman* rejected such an argument and held:

> While subsection (c) is not a model of grammatical perfection, "[cumbersome ... language does not necessarily render a policy provision ambiguous .... The Court finds that subsection (c) is not ambiguous, and that the ownership phrase describes the person committing the tort, not the status of the tenant]."

*Slip op.* at 6 (citation omitted). Similar to the court in *Goodman*, this Court finds that because Monarch had no legal interest in Green Tree's land,[18] subsection (c) affords Monarch no coverage.

### 3. Pollution Exclusion

In addition to Monticello's argument that Monarch's claims do not constitute a "suit" as defined by the policy, Monticello also argues that the damage caused by the 1997 occurrence was due to pollutants and coverage is thus excluded under the policy's pollution exclusion. The pollution exclusions reads, in pertinent part, the following:

> (1) ... "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
>
> > (a) at or from premises which is or was at any time owned or occupied, or rented or loaned to, any insured; ...
> >
> > (d) at or from any premises, site, or location on which any insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations;
> >
> > (i) if the pollutants are brought on or to the premises, site or location

---

17. Monarch asserts that *Goodman* has limited or no precedential value because it is an unpublished opinion and therefore Ninth Circuit Rule 36–3 applies. 36–3 states that an unpublished decision "shall not be regarded as precedent and shall not be cited to or by this Court or any district court of the Ninth Circuit." 36–3 applies only to Ninth Circuit decision designated as unpublished and does not apply to district court decisions.

18. Green Tree is the only party that has alleged damages due to trespass or nuisance.

in connection with such operations by such operations by such insured, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or access the effects of pollutants; or

(b) Claim or suit by or on behalf of a government authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Docket No. 21 Ex. A at MG005617.

The Idaho Supreme Court has stated:

[A]n insurer has a duty to defend its insured where the facts alleged in the complaint, if true, would bring the case within the insurance policy's coverage. The basis for this rule is simple. To allow the insurer to avoid providing defense on questionable claims would frustrate one of the insured's basic purposes in procuring insurance coverage—protection from the expenses of litigation. This duty is separate, unrelated, and much broader than the insurer's duty to pay damages.

*Black v. Fireman's Fund American Ins. Co.*, 115 Idaho at 455–56, 767 P.2d at 830–31 (1989)

*(internal citations omitted).*

■ Idaho courts have determined that "the duty to defend arises upon the filing of a complaint [19] whose allegations, in whole or in part, read broadly, reveal a potential for liability that would be covered by the insured's policy." *Id.* at 456, 767 P.2d at 831. *See also Kootenai County v. Western Casualty & Sur. Co.*, 113 Idaho 908, 911, 750 P.2d 87, 90 (1988) ("[t]he proper procedure for the insurer to take is to evaluate the claims and determine whether an arguable potential exists for a claim covered by the policy; if so, then the insurer must immediately step in and defend the suit"). "At the same time, if the insurer believes that the policy itself provides a basis, i.e., an exclusion, for non-coverage, it may seek declaratory relief." *Kootenai County v. Western Casualty & Sur. Co.*, 113 Idaho 908, 911, 750 P.2d 87, 90 (1988). If it is determined that an insurer owes a duty to defend, "the duty to defend and pay defense costs continues until such time as the insurer can show that the claim against the insured cannot be said to fall within the policy's scope of coverage." *Id.* "Furthermore, an insurance policy will generally be construed so that the insurer bears the burden of proving that the asserted exclusion is applicable." *Perry v. Farm Bureau Mutual Ins. Co. of Idaho*, 130 Idaho 100, 936 P.2d 1342, 1345 (1997). Thus, Idaho case law makes it clear that an insurance company must seek a declaratory judgment where the application of an exclusion involves a fairly debatable question of law.

The crux of the matter in this case is that Monticello would have breached its duty to defend if the pollution exclusion provided a fairly debatable question of law. If a fairly debatable question of law is found to have existed, Monticello was required to provide a defense for Monarch until they sought a declaratory judgment

**19.** The "filing of a complaint" is not required in this case. Instead, the policy requires the existence of a "civil proceeding." As construed by the Court, a "civil proceeding" not only refers to an action filed in court, but includes other non-criminal proceedings conducted by a court, or by persons authorized by the law to do so.

on the application of the pollution exclusion. While it would not be in the best interest of justice to require an insurance company to seek a declaratory judgment every time a claim is filed; insurance companies should not be able to deny coverage if a question of law exists as to the application of the policy. In deciding whether to cover a claim insurers, at times, appear to lose sight of the purpose for which insurance serves. The purpose of insurance is that of indemnity to the insured in case of loss or the payment of money on the happening of a contingency, to which end the law makes every reasonable inference, so as to give the fullest protection possible to the interests of the insured.

Here, Monticello argues that the pollution exclusion is absolute and unambiguous and the damages that resulted from the occurrence fall squarely within the pollution exclusion. They contend that the pollution exclusion does not provide a fairly debatable question of law and it was not necessary to seek a declaratory judgment because the pollution exclusion denied coverage. On the other hand, Monarch provides several arguments as to why a fairly debatable question exists as to the application of the pollution exclusion. The Court will address each of Monarch's arguments in turn.

### (i) Personal Injury Coverage Does Not Apply to this Case

Monarch first argues that the policy's pollution exclusion does not apply to Coverage B (personal injury coverage). Based on the Court's prior findings, that Coverage B does not apply to this case, whether the pollution exclusion applies to Coverage B is irrelevant for purposes of the currently pending motions. Accordingly, the Court finds that whether or not the policy's pollution exclusion applies to personal injury coverage does not create a fairly debatable question of law as to the application of the policy exclusion.

### (ii) The Policy's Definition of "Pollutant" is Not Ambiguous

■ Next, Monarch argues that the policy's definition and application of pollutant is ambiguous. As previously stated, a contract provision is ambiguous if it is reasonably subject to conflicting interpretation. *See Walker*, 130 Idaho 824, 948 P.2d at 1130. An ambiguity exists when a provision is susceptible to two different meanings, one of which permits recovery while the other does not. *See Pintlar*, 948 F.2d at 1513. "There is no obligation on courts to countenance a tortured construction of an insurance contract's language in order to create an ambiguity and thus provide an avenue for coverage where none exists." *Roberts*, 128 Idaho at 236, 912 P.2d at 123.

The policy at issue here defined pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Docket No. 21 Ex. A at MG005617.

Monticello argues, *inter alia*, that the tailings alleged to have caused damage in this case are pollutants because mining wastes are *per se* hazardous and fall within the definition of "pollutant".[20] In support of this argument, Monticello cites to *State of Idaho v. Bunker Hill Co.*, 635 F.Supp. 665, 672–73 (D.Idaho 1986), where, they claim, "Judge Ryan specifically held that mining wastes are hazardous substances under CERCLA." Docket No. 29 at 10. While this Court ultimately agrees that the tailings here are pollutants, the Court finds that Judge Ryan did not specifically hold that mining wastes are hazardous substances under CERCLA. Instead, Judge Ryan determined that mining wastes are *subject to* coverage under CERCLA. *See id.* at 673 (emphasis added). His conclusion appears to be based partially on the following EPA statement: "the agency believes that mining wastes

---

**20.** Tailings are defined as the "superfluous material produced by the manufacturing process;" "an unwanted by-product of a manu-

facturing process;" and "discarded as worthless, ... of no use." Webster's 1330–31 (9th ed.1991).

can be considered hazardous substances under CERCLA if it meets any of the other statutory criteria." *Id.* The tailings in this case meet the statutory criteria of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), classifying them as "hazardous substances".[21] Thus, not only are mine tailings within the pollution exclusion's definition of "pollutant", but also the "hazardous substances" found within the tailings clearly constitute an "irritant" or "contaminant" and are "pollutants".

Monarch argues that the because arsenic is a naturally occurring element in and around the site, the pollution exclusion would not apply because the arsenic has nothing to do with the mining process. In order for Monarch's argument to be valid, the arsenic would have had to have been found in its unaltered form, or altered solely through naturally occurring processes. *See* 42 U.S.C. § 9604(3).[22] Here however, the arsenic is not found in its unaltered form because mining, an unnatural process, has altered its location. Accordingly, this Court finds that the policy's definition and application of pollutant is not ambiguous and, as such, does not create a fairly debatable question of law as to the application of the pollution exclusion.

### (iii) The Pollution Exclusion is Not Limited to Active Polluters

■ Third, Monarch argues that the pollution exclusion applied only to active industrial polluters. Although such a belief by Monarch may have been genuine, the Court has found that the pollution exclusion is not ambiguous and; accordingly, can not get to the parties intentions or beliefs with regard to the policy. In addition to its previous finding, the Court notes that there is no language within the pollution exclusion to suggest that it applies only to active polluters. Accordingly, the Court is not convinced by Monarch's argument and further finds no fairly debatable question of law as to the application of the pollution exclusion.

### (iv) The Claims Are Limited to Damage Caused by "Pollutants"

Fourth, Monarch argues that even if a "pollutant" existed as defined in the pollution exclusion, the damages alleged based on the volume of debris and landslide itself would not fall within the pollution exclusion. They contend that the damages attributed to the clean-up of the actual tailings and the damages related to the landslide do not involve "pollutants" and the pollution exclusion should not apply. The Court has held that the tailings themselves are "pollutants" and as such, the clean-up of the tailings is necessary in order to comply with CERCLA. Furthermore, the damage resulting from "the destruction of and sweeping away of top soil, trees, and the like, ..." is a result of damage caused by the tailings, which again, the Court has found to fall within the definition of "pollutant". Accordingly, no fairly debatable question of law results from this argument.

21. § 9601(14) reads, in pertinent part, the following:.

The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act 42 U.S.C. § 6921 (but not including any waste the regulation of which under the Solid Waste Disposal Act 42 U.S.C. § 6901 et seq., has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, ...,

(F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15.

22. § 9604(3) reads, in pertinent part, the following:

The President shall not provide for a removal or remedial action under this section in response to a release or threat of release (A) of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found.

#### (v) Investigation is Not Proof of Fairly Debatable Question of Law

██ Finally, Monarch alleges that Monticello's own investigation provides proof that the application of the pollution exclusion contained some debatable questions of law. In a letter dated June 4, 1997, Monarch attempted to turn over the matter to Monticello for defense. On July 11, 1997, Monticello informed Monarch, via written correspondence, of their intention to investigate the matter before making a decision whether to provide coverage. On October 20, 1997, Monticello denied coverage. One might infer that the length of Monticello's investigation showed the complication of the questions involved. However, that inference does not, by itself, show a fairly debatable question of law.

Under Idaho law, Monticello would have had a duty to defend if a fairly debatable question of law existed regarding the application of the pollution exclusion. Such a duty would have existed until Monticello received a declaratory judgment ruling the pollution exclusion was applicable. Because a fairly debatable question did not exist, Monticello had no obligation to receive a declaratory judgment and had the right to deny coverage based on the fact that the pollution exclusion applied to all claims made against Monarch.

#### B. Monarch's Rule 56(f) Motion

Federal Rule of Civil Procedure 56(f) provides that if a party opposing summary judgment demonstrates a need for further discovery in order to obtain facts essential to justify the party's opposition, the trial court may deny the motion for summary judgment or continue the hearing to allow for such discovery. The decision to postpone ruling on a defendant's summary judgment motion in order to allow plaintiff additional time for discovery is in the sound discretion of the Court. *Citicorp Real Estate Inc., v. Smith,* 155 F.3d 1097, 1102 (9th Cir.1998).

██ In making a Rule 56(f) motion, a party opposing summary judgment "must make clear what information is sought and how it would preclude summary judgment." Fed.R.Civ.P. 56(f). Thus, "[t]he burden is on the party seeking to conduct additional discovery to proffer sufficient facts to show that the evidence sought exists, and that evidence would prevent summary judgment." *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 920–21 (9th Cir.) (1997) (citations omitted). The moving party must also have been diligent in its pursuit of discovery in the past. *Id.* at 921.[23]

██ Where the party opposing summary judgment has a request for discovery pending at the time the motion for summary judgment is filed, all that is required in the Rule 56(f) continuance is to make clear what information is sought and why.[24] It would be inappropriate for the court to grant summary judgment where the material sought is also the subject of outstanding discovery requests. *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,* 784 F.2d 1472, 1475 (9th Cir.1986). However, a Rule 56(f) motion cannot be filed after the deadline set for filing of the opponent's response brief and affidavits. *See Ashton–Tate Corp. v. Ross,* 916 F.2d 516, 520 (9th Cir.1990).

This complaint was originally filed July 17, 1998, and removed to this Court on August 14, 1998 (Docket No. 1). On May 21, 1999, Monticello moved for summary judgment. Docket No. 23. Monarch re-

---

**23.** The court should deny a 56(f) motion for continuance if the party moving failed to diligently pursue discovery before summary judgment. *Mackey v. Pioneer National Bank,* 867 F.2d 520, 524 (9th Cir.1989)

**24.** "A Rule 56(f) motion must show how additional discovery would preclude summary judgment and why a party cannot immediate-

ly provide 'specific facts' demonstrating a genuine issue of material fact." *Mackey,* 867 F.2d 520, 524. The court has relaxed this requirement when the party opposing summary judgment has pending a motion for further discovery, that makes clear what information is sought and why. *Garrett v. City and County of San Francisco,* 818 F.2d 1515, 1518–19 (9th Cir.1987).

sponded on June 4, 1999, (Docket No. 30), and Monticello replied on June 18, 1999 (Docket No. 31). Monarch filed their Rule 56(f) Motion on July 8, 1999. Docket No. 33.

Under Local Rule 7.1(a)(2), a party has fourteen days to respond after being served with a motion. The moving party then has fourteen days to file a final reply. Local Rule 7.1(a)(2) must be read together with Fed.R.Civ.P. 6(e) which gives three additional days when two requirements are met: (1) time limit begins to run upon service (which is true under Local Rule 7.1(a)(2)); and (2) the service was actually accomplished by mail (which occurred in this case). Monarch filed its response with the Court on June 4, 1999. In accordance with the local and federal rules, the deadline for Monticello to file its reply was June 21, 1999, seventeen days after service of the response. This was the same day Monarch was required to file their Rule 56(f) Motion. By filing their motion on July 8, 1999, the Court finds that it is untimely and pursuant to its discretion, hereby denies the motion.

## IV. CONCLUSION

For the reasons stated above, the Court finds that while some of the claims against Monarch constituted a "suit" for purposes of the policy, and would have been covered by the policy under Coverage A, Monticello had no duty to defend Monarch because the pollution exclusion applied to all claims asserted against Monarch. The Court further finds that Monticello was not required to seek a declaratory judgment as to whether the pollution exclusion applied because no fairly debatable question of law existed. Accordingly, the Court finds that Monarch is not entitled to either defense costs or indemnification. Finally, this Court finds that Monarch's Rule 56(f) was untimely filed and is therefore denied.

## V. ORDER

Based on the foregoing, and the Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment regarding duty to defend (Docket No. 18) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 23) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Rule 56(f) Motion to Extend Time to Respond to Motion for Summary Judgment (Docket No. 30) is **DENIED.**