916 F.2d 516
 59 USLW 2298, 1990 Copr.L.Dec. P 26,640,
16 U.S.P.Q.2d 1541
 ASHTON-TATE CORPORATION, a Delaware corporation,
Plaintiff-Counterdefendant-Appellee,
v.
Richard ROSS; Bravo Technologies, Inc., a California
corporation, Defendants-Counterclaimants-Appellants.
 No. 89-15683.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 17, 1990.
Decided Oct. 4, 1990.
 
 Paul N. McCloskey, Jr., McCloskey & Kays, Menlo Park, Cal., for defendants-counterclaimants-appellants.
 Gary L. Reback, Fenwick, Davis & West, Palo Alto, Cal., for plaintiff-counterdefendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before CHOY, WIGGINS and LEAVY, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 This appeal involves a dispute over the copyright ownership of a computer spreadsheet program called "Full Impact" and the alleged misappropriation of Appellants' trade secrets by Ashton-Tate. The district court published its order granting summary judgment on all claims in favor of Ashton-Tate. Ashton-Tate v. Ross, 728 F.Supp. 597 (N.D.Cal.1989). Appellants, Richard Ross and his company Bravo Technologies, Inc., argue that the district court abused its discretion by refusing to consider their supplemental brief in opposition to the summary judgment motion. They also argue that the district court erred in any event by declaring Ashton-Tate the sole owner of the copyright in Full Impact. Finally, they argue that the district court should not have ruled that their trade secret claims were time-barred. We affirm.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 In September 1984 appellant Richard Ross (Ross) decided to collaborate with Randy Wigginton (Wigginton) on the development of a computer spreadsheet program for the Apple Macintosh computer. Ross alleged that he and Wigginton agreed that Ross would work on the "engine," or computational component of the program, and Wigginton would work on the user interface portion. During September 1984 through February of 1985, Ross and Wigginton worked on their respective portions of the program. They also met on at least two occasions to discuss ideas and concepts for the program. At one of these meetings, Ross gave Wigginton a handwritten list of user commands he felt the interface should contain. The actual writing of the user interface portion of the program was done by Wigginton, however. Ross did all the writing of the computational half of the program.
 
 
 3
 Ross and Wigginton had not entered into any formal or written contract other than a nondisclosure of proprietary information agreement. In February 1985 the collaborators started to disagree about how they would publish and market their new program. Ross wanted to publish and distribute the product using his independent company, Bravo Technologies. Wigginton apparently wanted a more established company to publish and market the program.
 
 
 4
 In March, Wigginton made a presentation to employees of Ashton-Tate, one of the Nation's largest software publishers, to see if Ashton-Tate might be interested in publishing the spreadsheet program he and Ross were developing. When Ross learned of Wigginton's meeting with Ashton-Tate, he confronted Wigginton on March 28, 1985. According to Ross, once it became clear to Wigginton that Ross and Bravo were not interested in having Ashton-Tate publish the spreadsheet, Wigginton informed Ross that he was going to work for Ashton-Tate and was going to take the user interface portion of the MacCalc prototype with him.
 
 
 5
 In April 1985 Wigginton did go to work for Ashton-Tate. He and his company, "Encore," continued to work on the user interface and adapted it for use with a new engine from a program called "Alembic," which Ashton-Tate already had an interest in. Eventually, the combination of Wigginton's user interface and the adapted Alembic engine became the "Full Impact" spreadsheet program released by Ashton-Tate. Meanwhile, Ross worked on his spreadsheet program. By June of 1986, he completed work on a user interface to combine with his engine and published "MacCalc."
 
 
 6
 On April 17, 1985, Ross met with representatives of Ashton-Tate to discuss working on an Ashton-Tate program for IBM personal computers. Ross signed Ashton-Tate's nondisclosure agreement and Micheal Stone of Ashton-Tate signed Bravo's, Ross's company. According to Ross, Stone asked about the MacCalc product, whereupon Ross obtained Stone's assurance that the nondisclosure agreement would cover any discussion about MacCalc. Ross also claims that he subsequently received confirmation from Roy Folk, an outside consultant to Ashton-Tate and the other person at the meeting, that the nondisclosure agreement covered Wigginton's earlier demonstration of the MacCalc prototype.
 
 
 7
 In June 1985, Ross wrote to Stone to express concern that Ashton-Tate was using his and Bravo's proprietary information to help develop a spreadsheet program. Ross received no response to this inquiry. Ross also alleges that in June 1987 Dave Stephenson, a marketing manager at Ashton-Tate, contacted Ross to discuss the possibility of Ross assisting in the development of a Macintosh spreadsheet program tentatively called "Glass." Ross claims to have again expressed concern about Ashton-Tate's possible use of Bravo's proprietary information. Ross asserts that Stephenson assured him things would be worked out and that there was only a "fifty-fifty" chance that Ashton-Tate would actually complete "Glass." Ross claims to have discussed his concerns with other Ashton-Tate executives during 1987, and to have received assurances from each one.
 
 
 8
 Ashton-Tate neither acknowledges nor denies that it approached Ross about working on the engine of the Glass project, but denies that Ross was given any assurances. Ashton-Tate insists that Ross fabricated these assurances to avoid summary judgment, and that his allegations flatly contradicted his earlier deposition testimony.
 
 
 9
 On June 12, 1988, Ross demanded that Ashton-Tate compensate him and Bravo for their contribution to the Full Impact program. On July 20, 1988, Ashton-Tate filed its complaint for declaratory relief. Ross and Bravo responded by filing their answer and counterclaims on August 24, 1988.
 
 Proceedings Below
 
 10
 At a status conference on October 19, 1988, Ashton-Tate notified Ross and Bravo that it intended to file a motion for summary judgment. On December 22, 1988, Ashton-Tate filed its summary judgment motion. Appellants Ross and Bravo filed their response on January 11, 1989.
 
 
 11
 At the January 25 hearing on Ashton-Tate's summary judgment motion, Ross and Bravo requested additional time so an expert could examine recently produced evidence to determine whether the engine portion of the Full Impact program utilized source code from the MacCalc prototype. The court granted Ross and Bravo their request for additional time, but only for the purpose of determining whether development of the Full Impact engine had relied on the engine from the MacCalc prototype.
 
 
 12
 Ross and Bravo filed their supplemental brief in opposition to Ashton-Tate's summary judgment motion on February 24, 1989. The material submitted, which included declarations from experts Lang and Hoffman, did not comply with the district court's order granting additional time. Ross and Bravo requested that the district court consider their supplemental brief under Fed.R.Civ.P. 56(f). They asked the district court to consider the brief because the information forming the basis of the declarations contained therein was not available during the drafting of their original opposition brief.
 
 
 13
 The district court rejected Ross and Bravo's Rule 56(f) motion in an order dated March 31, 1985. It held that the motion was not timely made, that the expert declarations were cumulative of material already presented in opposition to the summary judgment motion, and that Ross and Bravo failed to show that the foundation evidence for the expert declarations could not have been obtained far enough in advance to incorporate into the initial opposition brief. The district court therefore refused to consider the supplemental brief except as it related to the issue of source code copying of the engine portion of the MacCalc prototype.
 
 
 14
 On April 4, 1989, the district court issued a published order granting Ashton-Tate's motion for summary judgment on all issues. 728 F.Supp. 597. The court held that even if there was an agreement to collaborate, Ross's contribution of ideas to the user interface written by Wigginton was insufficient to make Ross a joint author of the interface. 728 F.Supp. at 602.
 
 
 15
 The district court ruled against Ross and Bravo on their other theories as well, including their state law cause of action for misappropriation of trade secrets by Ashton-Tate. The court made this ruling on the basis that the applicable limitation period had run. Ross and Bravo timely appealed.
 
 ISSUES
 
 16
 I. Did the district court abuse its discretion in denying Ross and Bravo's request to consider additional material in opposition to the summary judgment motion?
 
 
 17
 II. Did the district court err in holding that Ross and Bravo had no copyright interest in the user interface portion of the Full Impact program?
 
 
 18
 III. Did the district court err in holding Ross and Bravo's misappropriation of trade secrets action time barred?
 
 STANDARDS OF REVIEW
 
 19
 Denial of a Rule 56(f) application is reviewed for abuse of discretion. Visa Int'l Service v. Bankcard Holders, 784 F.2d 1472, 1475 (9th Cir.1986). The district court's grant of summary judgment is reviewed de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).
 
 DISCUSSION
 I.
 Denial of Rule 56(f) Motion
 
 20
 The district court acted well within its discretion in refusing to consider most parts of the belated declarations of Lang and Hoffman. Ross and Bravo failed to invoke Fed.R.Civ.P. 56(f) in a timely manner. At the summary judgment hearing, appellants requested more time for the narrow purpose of examining the source code for "Glass," the prototype for Full Impact, to determine whether Full Impact relied in any manner on the engine of the MacCalc prototype. Ross and Bravo's Rule 56(f) motion was made concurrently with the submission of their supplemental brief, more than six weeks after the summary judgment hearing.
 
 
 21
 Ross and Bravo contend that there is no particular time by which a Rule 56(f) request must be made. They cite Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518-19 (9th Cir.1987) for the proposition that a Rule 56(f) motion can be timely even when filed after the granting of summary judgment. Garrett does not aid appellants. In Garrett, appellant had a discovery motion pending, which this court construed as equivalent to a Rule 56(f) motion, when the district court entered summary judgment. This court merely held that the district court should have considered appellant's discovery request prior to entering summary judgment.
 
 According to Wright, Miller and Kane:
 
 22
 Clearly, subdivision (f) must be read in conjunction with subdivision (e) of Rule 56.... [W]hen the movant has met the initial burden required for the granting of summary judgment, the opposing party must establish a genuine issue for trial under Rule 56(e) or explain why he cannot yet do so under Rule 56(f). Rule 56(c) states that affidavits filed under either subdivision must be filed prior to the day of the hearing.
 
 
 23
 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil Sec. 2740 (emphasis added).
 
 
 24
 Rule 56(c) does not explicitly refer to either subdivisions (e) or (f). Rather, it refers to "opposing affidavits." One could argue that a Rule 56(f) motion is not technically an opposing affidavit and that the time restriction in Rule 56(c) does not apply to a Rule 56(f) motion. See Id. Sec. 2719. The problem with such legal sophistry, however, is illustrated by the facts of this case. Appellants' Rule 56(f) motion requested that the district court consider supplemental expert affidavits; it thus amounted to an introduction of additional "opposing affidavits." The district court was not required to allow this effort to avoid reasonable time constraints.
 
 
 25
 A request for additional time, more discovery, or, in this case, a request to consider late affidavits under Rule 56(f) does "oppose" the entering of summary judgment, which implies that the time constraint in Rule 56(c) should apply. Further, the process of evaluating a summary judgment motion would be flouted if requests for more time, discovery, or the introduction of supplemental affidavits had to be considered even if requested well after the deadline set for the introduction of all information needed to make a ruling has passed. See Pfeil v. Rogers, 757 F.2d 850, 858 (7th Cir.1985) (district court's decision to disregard all material filed after a reasonable filing deadline was not an abuse of discretion because it allowed court to preserve moving party's right to respond to resisting party's arguments and to decide summary judgment motion in a timely fashion); see also Nestle Co., Inc. v. Chester's Market, Inc., 571 F.Supp. 763, 773 (D.Conn.1983) (failure to offer any explanation or justification for not filing opposing affidavit until one month after hearing requires that it not be considered; to do otherwise would be bending even the liberal Federal Rules so out of shape as to have no meaning).
 
 
 26
 Thus, implication and logic require that a Rule 56(f) motion be made prior to the summary judgment hearing. We therefore affirm the district court's decision not to consider the portions of the supplemental affidavits that are unrelated to source code copying of Ross's engine. Consequently, we also refuse to consider the expert affidavits of Lang and Hoffman except as they address the issue of source code copying of the prototype engine.
 
 II.
 Copyright Ownership of Full Impact
 
 27
 Appellants present three separate theories why the district court erred in declaring that they had no copyright interest in the Full Impact program. First, they argue that Ross's contribution of ideas and guidance for the user interface created a triable issue of whether he was a joint author of the interface. Next, they claim that Ross's handwritten sheet of commands provided to Wigginton constituted copyrightable expression, thereby making Ross a joint author of the interface. Finally, they insist that the "joint work" was the entire MacCalc prototype, which included the user interface written by Wigginton and the engine written by Ross, and thus Ross became a joint author of the entire prototype; therefore, they claim Ross is a joint author of Full Impact because its user interface is derived substantially from the MacCalc user interface. We reject each of these theories.
 
 
 28
 A. Are Intention and Ideas Enough?
 
 
 29
 As the district court correctly noted, a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. Sec. 101 (1977). The authors of a joint work are co-owners of the copyright in that work. 17 U.S.C. Sec. 201(a). The question presented by Appellants' first theory, where Ross claims authorship on the basis of an alleged agreement to collaborate combined with his noncopyrightable contribution to the interface, is what satisfies the requirements for joint authorship.
 
 
 30
 The district court held that "[b]ecause Ross only contributed ideas to the Full Impact interface, which by themselves are not protectable, the program is not a 'joint work' between Ross and Wigginton." 728 F.Supp. at 602. The rule expressed by the district court--that only contributors of copyrightable material can be authors of a work--is not entirely settled, but is consistent with the direction our circuit has taken.
 
 
 31
 Academic authorities split on what type of "contribution" the copyright law requires for joint authorship purposes. The Nimmers argue that:
 
 
 32
 If authors A and B work in collaboration, but if A's contribution is limited to plot ideas which standing alone would not be copyrightable, and B weaves the ideas into a completed literary expression, it would seem that A and B are joint authors of the resulting work.
 
 
 33
 M. & D. Nimmer, 1 Nimmer on Copyright Sec. 6.07, p. 6-18 (1989). Conversely, Goldstein in Copyright: Principles, Law and Practice, takes a different view:
 
 
 34
 A collaborator's contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright.
 
 
 35
 P. Goldstein, Copyright: Principles, Law and Practice, Sec. 4.2.1 p. 379 (1989).
 
 
 36
 The district court adopted the view championed by Professor Goldstein. This court recently adopted the same position in S.O.S. Inc. v. Payday Inc., 886 F.2d 1081, 1086-87 (9th Cir.1989). In Payday, the appellee claimed joint authorship of a computer program on the basis of contributions to the design of the program. We ruled that such a contribution was insufficient to raise a material issue of fact about whether such a contributor was a joint author. Id., citing Whelan Assocs. v. Jaslow Dental Laboratory, 609 F.Supp. 1307, 1318-19 (E.D.Pa.1985), aff'd, 797 F.2d 1222 (3d Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). We held in Payday that "[t]o be an author, one must supply more than mere direction or ideas; one must 'translate[ ] an idea into a fixed tangible expression entitled to copyright protection.' Community for Creative Non-Violence v. Reid, [490 U.S. 730,] 109 S.Ct. 2166, 2171 [104 L.Ed.2d 811] (1989)." Id.
 
 
 37
 Payday involved a dispute over a commissioned work. The Reid decision quoted in Payday stated the general rule that a person must translate ideas into copyrightable expression to receive copyright protection as an author of a work. Reid also pointed out, however, that the Copyright Act carves out an important exception for works made for hire. 109 S.Ct. at 2171. Further, Reid left undecided whether joint authorship is another exception to the general rule that to be an author one must make an independently copyrightable contribution to a work. Neither party in Reid had appealed the D.C. Court of Appeals' decision to remand the joint authorship issue to the district court. The D.C. Court of Appeals remanded because it thought it possible that the plaintiff had contributed copyrightable expression to the work, and that one might be an author of a "joint work" by making significant contributions even if they are not independently copyrightable. 846 F.2d 1485, 1496-98 (D.C.Cir.1988).
 
 
 38
 Even though this issue is not completely settled in the case law, our circuit holds that joint authorship requires each author to make an independently copyrightable contribution. Thus the district court properly decided this issue against Appellants.
 
 
 39
 B. Was Ross's Contribution to the User Interface Copyrightable?
 
 
 40
 Appellants argue that the handwritten list of user commands Ross gave to Wigginton was a fixed expression of Ross's ideas, and as such was entitled to copyright protection. They contend that this list was used by Wigginton to help develop the user interface and therefore, Ross is a joint author of the interface portion of Full Impact. This argument is meritless for the reasons given in the district court's order, 728 F.Supp. at 602. The list simply does not qualify for copyright protection.
 
 
 41
 C. Did Ross's Copyrightable Contribution to the MacCalc Prototype Make Him a Joint Author of Full Impact?
 
 
 42
 Appellants also claim that Ross is a joint author of the Full Impact program on the basis of his contribution to the MacCalc prototype. They argue that because Ross contributed copyrightable expression to the MacCalc prototype by writing the engine portion of the program, he is a joint author of the prototype and that this gave him an undivided ownership interest in the entire prototype. Hence, they argue, Full Impact's use of the user interface portion of the MacCalc prototype made Ross a joint author of that program as well.
 
 
 43
 The district court focused on the user interface and Ross's contributions to it when determining appellants' joint authorship claim. This made sense, because this was the theory pushed by Appellants, and at the time the contribution requirement for authorship of joint works was not settled in this circuit. It is possible, however, to conceive of the entire MacCalc prototype as a joint work. Indeed, if Ross and Wigginton intended to create a joint work, and both contributed copyrightable material to the resulting work (the MacCalc prototype), then they may have both obtained an undivided interest in the entire work. 17 U.S.C. Sec. 201(a); 1 Nimmer on Copyright, Sec. 6.03 (1989).
 
 
 44
 In other words, Ross may have obtained a one-half ownership interest in the user interface and Wigginton may have obtained a one-half interest in the engine. We need not decide this issue now, however. Even assuming, arguendo, that Ross does have a one-half interest in the interface written by Wigginton, it does not follow that Ross is a joint author of the Full Impact program because its interface is derived from his and Wigginton's joint work. The Second Circuit's decision in Weissmann v. Freeman, 868 F.2d 1313 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989), is a clear refutation of this position. Joint authorship in a prior work is insufficient to make one a joint author of a derivative work: "[i]f such were the law, it would eviscerate the independent copyright protection that attaches to a derivative work that is wholly independent of the protection afforded the prexisting work." Id. at 1317. The analysis in Weissmann is sound, and we adopt its reasoning on this point.
 
 
 45
 Interestingly, the court in Weissmann also discussed the situation where a joint work is utilized or licensed for use in a derivative work by one of the co-authors of the joint work. In such a situation, no cause of action for infringement exists, "because an individual cannot infringe his own copyright. The only duty joint owners have ... is to account for profits from [the joint work's] use." Id. at 1318.
 
 
 46
 This circuit made a similar ruling in Oddo v. Ries, 743 F.2d 630 (9th Cir.1984). There a co-owner of a copyright in an unpublished guide book had infringed the other co-owner's copyright by publishing a revised and expanded guide book that used much of the original unpublished one. We held that a co-owner cannot be liable for infringement of the copyright, and that each author has the independent right to use or license the copyright subject only to a duty to account for any profits he earns from the licensing or use of the copyright. Id. at 633. The duty to account for profits for use or licensing a joint work does not derive from the copyright law's proscription of infringement but it stems from equitable doctrines relating to unjust enrichment and general principles of law governing the rights of co-owners. Id.
 
 
 47
 Appellants discussed this theory for protecting their legal interest on the penultimate page of their response brief, where they state that "[w]hether or not Ross is considered a joint author of the Full Impact, he is entitled to an accounting of the profits of Full Impact to the extent that the product utilizes his undivided ownership interest in the MacCalc user interface." This might be correct if Wigginton were the owner of Full Impact and appellants had sued him. However, because Wigginton presumably sold his services and the use of the user interface to Ashton-Tate for use in Full Impact, appellants at most have a right to a share of the proceeds Wigginton has received or receives for the use of the interface (assuming Appellants can prove that the prototype was a joint work Ross has an undivided ownership interest in and part of the work was used in Full Impact).
 
 
 48
 In short, it appears that Appellants have misframed the type of relief they could litigate with any possibility of success. While an author of a joint work does not acquire an authorship interest in derivative works that utilize part of the joint work, that author may be entitled to compensation for the use of the original joint work. The problem for Appellants in this appeal, however, is that such a claim for compensation is not a copyright claim. Furthermore, the claim would have to be against the alleged "co-author" Wigginton, because he was the person who allegedly allowed Ashton-Tate to use the user interface portion of the joint work for use in Full Impact.
 
 
 49
 We wish to clarify, however, the district court's statement that "[b]ecause Ross only contributed ideas to the Full Impact interface, ... the program is not a 'joint work' between Ross and Wigginton." 728 F.Supp. at 602. While the court was correct to hold that the user interface is not a "joint work" as a result of Ross's contribution to the interface itself, the court did not resolve whether Ross's copyrightable contribution to the engine of the MacCalc engine entitled him to an undivided interest in the entire prototype, including the interface. We do not decide this question either, because it is unnecessary to the resolution of this appeal.
 
 
 50
 Thus we affirm the district court's order granting summary judgment on Ashton-Tate's request for a declaration that: (1) Ashton-Tate owns all the copyright interest in Full Impact; and (2) Full Impact does not infringe upon existing copyrights. Similarly, it was proper to enter summary judgment against Appellants' counterclaim for declaratory relief with respect to their copyright interest in Full Impact.
 
 III.
 
 51
 Trade Secret Claims, Commencement of the Limitation Period
 
 
 52
 In its order granting Ashton-Tate's summary judgment motion, the district court ruled that Appellants' trade secret claims were time-barred under the applicable statute of limitation. The court also expressed its belief that the alleged trade secrets were not actually trade secrets at all, but it did not make a ruling on this point. 728 F.Supp. at 603 fn. 2. We agree with the district court that Appellants' trade secret claims were time-barred.
 
 
 53
 There is agreement that Cal.Civ.Code Sec. 3426.6 contains the applicable statute of limitation. It reads:
 
 
 54
 [a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purpose of this section, a continuing misappropriation constitutes a single claim.
 
 
 55
 Cal.Civ.Code Sec. 3426.6 (1989). "Misappropriation" is defined in a separate section of California's trade secret laws as:
 
 
 56
 (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
 
 
 57
 (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
 
 
 58
 . . . . .
 
 
 59
 (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
 
 
 60
 . . . . .
 
 
 61
 (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.
 
 
 62
 Cal.Civ.Code Sec. 3426.1 (1989).
 
 
 63
 California only recently adopted the Uniform Trade Secrets Act (UTSA), but we believe the district court correctly interpreted the language of the statute and properly applied it to this dispute. The initial misappropriation in this case, if any, occurred in February 1985 when Wigginton disclosed Appellants' alleged trade secrets to Ashton-Tate. Ross learned of this incident in March, 1985. It is true that if Ashton-Tate subsequently used these secrets, that also constitutes misappropriation. The statute of limitation, however, specifically states that a continuing misappropriation constitutes a single claim. Thus Appellants' argument is unpersuasive that the limitation period only commenced to run in 1988 upon their discovery of Ashton-Tate's use of the secrets.
 
 
 64
 The district court cited Whittaker Corp. v. ExecuAir Corp., 736 F.2d 1341 (1984), to support its view of when the "misappropriation" occurred and the limitation period started to run. ExecuAir held that the misappropriation claims in that case accrued when the alleged owner of the trade secrets became aware of the third party's (ExecuAir) acquisition of those secrets. Id. at 1345. While ExecuAir came down prior to California's adoption of the UTSA, we think it expresses the rule intended by Cal.Civ.Code Sec. 3426.6. See Milgrim, Milgrim on Trade Secrets, Sec. 7.04 fn. 14.1. We also find Appellants' estoppel claims meritless. Accordingly, we affirm the district court's well reasoned ruling on the trade secret claims.
 
 CONCLUSION
 
 65
 We AFFIRM the district court's grant of summary judgment in its entirety.
 
 
 66
 AFFIRMED.