Thomas R. DREILING, on behalf of INFOSPACE, INC., Plaintiff,

v.

Stiles A. KELLETT, Jr., an individual; and Kellett Partners LP, a limited partnership, and Naveen Jain and Anuradha Jain, husband and wife, and their marital community, the Jain Family Irrevocable Trust, the Naveen Jain Grat No. 1 Trust, and the Anuradha Jain Grat No. 1 Trust, Defendants,

and

Infospace, Inc., Nominal Defendant.

No. C01–1528P.

United States District Court, W.D. Washington.

May 14, 2003.

Order Denying Reconsideration July 9, 2003.

William H. Beaver, Jr., Karr Tuttle Campbell, Seattle, WA, for Naveen Jain Grat No 1 Trust, Defendant.

Beth Ann Colgan, Harry H. Schneider, Jr., Brent Snyder, Perkins Coie, Seattle, WA, for Jain Family Irrevocable Trust, Defendant

Timothy P Crudo, Paul H Dawes, David M. Friedman, Latham & Watkins, San Francisco, CA, Mark Maynes, Stokes Lawrence, Seattle, WA, Kevin Michael Paulich, Wolfstone, Panchot & Block; Seattle, WA, John C Tang, Aaron Levine & Associates, Washington, DC, for InfoSpace Inc, Interested Party.

Judith A Endejan, Graham & Dunn, Seattle, WA, Elaine L Spencer, Graham & Dunn, Seattle, WA, for Seattle Times Company, Intervenor.

Christine E Gardiner, Karr Tuttle Campbell, Seattle, WA, for Anuradha Jain Grat No 1 Trust, Defendant.

Douglas W Greene, Barry M. Kaplan, Perkins Coie, Seattle, WA, for Kellett Partners LP, Stiles A Kellett, Jr, Defendants.

Arthur W. Harrigan, Jr., Danielson Harrigan & Tollefson, Seattle, WA, G. Val Tollefson, Danielson Harrigan & Tollefson, Seattle, WA, for Anuradha Jain, Defendant.

Jonathan P Meier, Stephen John Sirianni, Richard E. Spoonemore, Sirianni & Youtz, Seattle, WA, for Thomas R Dreiling, Plaintiff.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

PECHMAN, District Judge.

This matter comes before the Court on cross-motions for summary judgment. (Dkt.Nos.68, 82.) Plaintiff alleges that the Jain Defendants engaged in prohibited short-swing trades of InfoSpace stock by

transferring shares from the Defendant trusts to personal and escrow accounts. Because these transfers are purchases for purposes of determining short-swing trades, Plaintiff's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.

## BACKGROUND

This is a suit by a shareholder of InfoSpace, Mr. Dreiling, against numerous insider Defendants, alleging that the insiders engaged in unlawful short swing trading— the purchase and sale (or vice versa) of stock within a six month period. There are two groups of Defendants in this matter: the Jain Defendants and the Kellett Defendants. The Kellett Defendants have settled the claims against them. (Dkt. No. 133.) Currently before the Court are cross-motions for summary judgment on Plaintiff's claims against the Jain Defendants. The Jain Defendants are the Naveen Jain, a founder and former CEO of InfoSpace, Anuradha Jain, and three trusts established by the Jains for the benefit of their children.

This litigation arises from stock transfers from three trusts established by the Jains in mid–1998: the Naveen Jain Grantor Retained Annuity Trust No. 1 ("NJGRAT"), the Anuradha Jain GRAT ("AJGRAT"), and the Jain Family Irrevocable Trust ("Family Trust"). The Jains established these trusts for tax purposes. Each of the two GRATs were initially funded with two million shares of InfoSpace stock. The Family Trust purchased one million shares of InfoSpace stock from the Jains. Naveen Jain's brother, Atul Jain, was named as the trustee of both GRATs. The GRATs are irrevocable, and the Jains receive annual annuities from the GRATs. Under the terms of the GRATs, the trustee is the owner of the trust estate The remainder of the trust estate of the GRATs is paid out to the Jains' children after the Jains' death. Unlike the GRAT, the Family Trust pays no annuity and the sole beneficiaries are the Jains' children.

Plaintiff alleges that the Jain Defendants engaged in four purchases that subject them to liability for short-swing trades. The first purchase allegedly occurred in December 1998, when Mr. Jain took one million InfoSpace shares from a trust and placed this stock in escrow to satisfy a personal indemnity obligation. The second, third, and fourth purchases took place in May 1999, when the Jains deposited trust shares into their personal trading accounts. Defendants argue that the above transactions were not "purchases," as they are understood under securities law.

The first alleged purchase in December 1998 occurred when Mr. Jain agreed to place in escrow one million shares of his InfoSpace stock. As InfoSpace was preparing for its initial public offering ("IPO") in late 1998, the Board of Directors learned that Mr. Jain might have incurred liability on behalf of InfoSpace through option grants and disputes arising out of commercial contracts. InfoSpace hired the law firm PerkinsCoie to investigate, and the Board later required Mr. Jain to personally indemnify the company for potential claims by placing one million shares of his InfoSpace stock in escrow. Mr. Jain executed an agreement with InfoSpace to establish an escrow, with InfoSpace as the escrow agent. PerkinsCoie drafted a Securities and Exchange Commission ("SEC") amendment filed on behalf of InfoSpace. (Spoonemore Decl. Ex. 24.) This filing represented that Mr. Jain had placed one million shares of common stock held by the NJGRAT trust in escrow, and that Mr. Jain retained voting control over those shares. (*Id.* Ex. 25.) Because the NJGRAT trust is irrevocable, Mr. Jain had no authority to transfer these shares.

Over the next year, Mr. Jain signed, or authorized his attorney in fact to sign, numerous SEC filings representing that he had placed the NJGRAT shares in escrow. (*Id.* Exs. 25–34.) A year later, after no claims were made against InfoSpace for Mr. Jain's actions, Mr. Jain requested that the Board release the escrowed shares. In early 2000, the Board officially released Mr. Jain from the indemnity agreement and the shares from escrow. Plaintiff alleges that the escrow agreement was an unlawful transfer of shares to Mr. Jain from the NJGRAT, triggering liability for short swing trades. Defendants contend that no escrow was ever in fact created. Despite the SEC filings, Mr. Jain states that neither he nor InfoSpace officially established the escrow. Defendants' attorneys in this matter, PerkinsCoie, states that it "is not clear why those [reporting] mistakes [to the SEC] were made." (Def's Resp. at 6.) Defendants produce statements from numerous other witnesses testifying to their lack of knowledge of an escrow account.

The other alleged purchases in May 1999 occurred when the Jains deposited shares of the trusts into their personal brokerage accounts. In May 1999, InfoSpace stock split two-for-one. InfoSpace then issued new stock certificates representing the new shares and sent these certificates to its shareholders. The NJGRAT and AJGRAT split share certificates were sent to InfoSpace's office, while the Family Trust split share certificate was sent to the Jains' home. These stock certificates were marked on their face as belonging to the trusts. Although the trust accounts were held by Banc of America Securities, the Jains sent the shares to their personal broker at Hambrecht & Quist ("H & Q").[1] H & Q deposited the

Family Trust shares in the Jains' personal account. H & Q then sent the Jains a draft letter of authorization that would "gift" the GRAT split shares to the Jains. After the Jains filled out these forms and returned them to H & Q, the shares were deposited into the personal trading accounts of the Jains. The Jains held and controlled these shares, for example by voting on them, until 2000, when it is alleged this "transfer error" was discovered. The Family Trust shares were reconveyed to the trust in May 2000. An InfoSpace paralegal who was responsible for tracking shares noticed a discrepancy in the Jains' account. (Haberly Dep. at 14–15.) However, Mr. Jain states that he initiated the request that InfoSpace undertake an internal investigation to determine what stock was held in each account, thereby identifying the transfer error. As a result of the investigation, the split shares were transferred back to the GRATs in December 2000.

The Jains claim that the transfers were innocent mistaken deposits. Mr. Jain states that he mistakenly believed that the Jain Trusts maintained accounts at H & Q. The Jains declare that they did not know that signing the letters of authorization would effect a gift of shares from the GRATs to their personal trading accounts. Because they did not read their brokerage statements, the Jains claim they were not aware of the transfers.

## ANALYSIS

The parties stipulated to presenting the issues in this case before the Court on cross-motions for summary judgment. (Dkt. No. 50.) Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58

---

1. The record is confused regarding whether Nationsbanc or Banc of America was the holder at the time.

F.3d 439, 441 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

Section 16(b) of the 1934 Securities and Exchange Act contains a blanket prohibition on insiders engaging in short-swing trades—purchasing and selling (or vice versa) within a six-month window. 15 U.S.C. § 78p(b). This is a bright-line rule designed to combat the possibility of unfair insider trading. An insider may be a corporate officer, director or 10% shareholder. *Id.* at (a)(1). If any corporate insider engages in short-swing trades, a shareholder may bring suit on behalf of the company, forcing the insider to disgorge all profits to the company. *Id.* at (b). The principal issue raised in the cross-motions for summary judgment is the legal question of whether the trust transactions are

purchases under federal securities law. Defendants make three basic arguments: (1) because the transfers from trusts to personal or escrow accounts did not constitute a change of beneficial ownership of the InfoSpace shares, none of the four disputed transactions was a purchase; (2) while the transfers from the trust to personal and escrow accounts may be mistakes or gifts, they are not purchases; (3) since no escrow was ever in fact established, Mr. Jain never purchased the InfoSpace that were to be placed in escrow.

■ It should be noted that Defendants' protests of innocent intentions are largely irrelevant since Section 16(b) imposes strict liability for short-swing trades. The statute requires disgorgement to the company of any profit derived from the matching of any purchase and any sale of an "equity security" within a six-month period by a statutory insider, irrespective of intent. *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir. 1998). "No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement." *Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316, 320 (2d Cir.1998). Rather, Section 16(b) "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Id.* at 320–21. The statute, therefore, "imposes liability without fault ... within its narrowly drawn limits." *Id.* at 321.

### I. Change in Beneficial Ownership

■ Section 16 liability for short-swing trades does not attach if the owner of a stock merely changes his or her form of ownership. Such a transaction is not a purchase, but a mere change in beneficial ownership. Changes in beneficial ownership are exempted from Section 16(b) lia-

bility. 17 C.F.R. § 240.16a–13. Defendants argue that all four transfers from the trusts to personal and escrow accounts were mere changes in the form of beneficial ownership. Plaintiff argues that the Jain Defendants did not have beneficial ownership of the stock in any of the trusts.

The general definition of "beneficial owner" is broad, and Defendants urge the Court to interpret the definition to include persons such as the Jains who receive annuities from a trust:

> [T]he term beneficial owner shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities, subject to the following.
>
> (i) The term pecuniary interest in any class of equity securities shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.

Rule 16a–1(a)(2). However, the regulations refer to another section to determine how to analyze beneficial ownership in the specific context of trusts.

> (ii) The term indirect pecuniary interest in any class of equity securities shall include, but not be limited to:
>
> .      .      .      .      .
>
> (E) A person's interest in securities held by a trust, *as specified in § 240.16a–8(b)*.

Rule 16a–1(a)(2) (emphasis added). Rule 16a–8 spells out how to analyze trust ownership.

The "settlor" or founder of the trust is considered the beneficial owner "where they have the power to revoke the trust without the consent of another person." Rule 16a–8(a)(2)(ii). There is no dispute that the Jains did not have the power to revoke the trusts, therefore the fact that they are settlors does not make them beneficial owners.

The beneficiary of the trust is considered a beneficial owner in a number of circumstances:

> (3) Beneficiaries. A beneficiary subject to section 16 of the Act shall have or share reporting obligations with respect to transactions in the issuer's securities held by the trust, if the beneficiary is a beneficial owner of the securities pursuant to § 240.16a–1(a)(2), as follows:
>
> (i) If a beneficiary *shares investment control* with the trustee with respect to a trust transaction, the transaction shall be attributed to and reported by both the beneficiary and the trust;
>
> (ii) If a beneficiary *has investment control* with respect to a trust transaction without consultation with the trustee, the transaction shall be attributed to and reported by the beneficiary only;

Rule 16a–8(b) (emphasis added). The Jains do not fall under either of the above categories. Although the Jains received annuity payments, they did not control the trust or share investment control with the trustee. Therefore, the Jains were not beneficial owners of the trust.

Treatises and case law agree that the above analysis directs the determination of beneficial ownership of trusts for purposes of Section 16 liability. *See Feder v. Frost,* 220 F.3d 29 (2d Cir.2000); Bloomenthal & Wolff, 3D *Securities and Federal Corporate Law* § 21.26 at 21–40 (2d ed 2002) ("Beneficiaries of a trust generally will not have the requisite voting or investment control to be beneficial owners for the purpose of determining insider status."), Loss & Seligman, V *Securities Regulation* at 2425 n. 169 (3d ed.2001). For example, a beneficiary has been held liable under Section 16 when he "purchased" shares with an IOU from a trust of which he was a beneficiary. *Morales v. Quintiles*

*Transnational Corp.*, 25 F.Supp.2d 369 (S.D.N.Y.1998). A transfer of InfoSpace shares from the trust to the Jains' personal accounts is a change in beneficial ownership

The public policy underlying the reporting and beneficiary ownership rules on trusts further bolsters Plaintiff's position. If the Jains did not control investment decisions of the trust, or even have reason to know of the transactions the trustee made, then it would be unfair to count such transactions as purchases or sales of the Jains. On the other hand, if the Jains maintained control over the investment decisions of the trusts and benefitted from those transactions, then the trusts' purchases and sales should be counted as the Jains. Loss & Seligman, V *Securities Regulation* at 2425–26 ("Where investment control is shared, including consultation between the trustee and beneficiary, both the trust and the beneficiary must report the transaction and are responsible for any resulting short-swing profits") (citing Sec. Ex. Act. Rel. 28,869 (1991)). Here, because the Jains did not exercise investment control over the trusts, they are not beneficial owners of the shares of the trusts. Normally, this policy operates to protect non-controlling trust beneficiaries from short-swing liability for trust transactions. In this case, however, the transactions at issue were not solely within the corpus of the trusts, but rather a transfer from the trusts to the Jains. Therefore, the Jains' transfer of shares from the NJGRAT, AJGRAT, and Family Trust to their personal trading accounts constituted a change in beneficial ownership. Also, transfer of stock from the NJGRAT trust to an escrow account to satisfy a personal obligation of Mr. Jain effected a change in beneficial ownership.

The above analysis disposes of two additional issues raised by the Defendants. Because the Jain Defendants admit that they did not report the "misdeposits" from the trusts to their personal accounts that effected a change in beneficial ownership, the statute of limitations is tolled. *Whittaker v. Whittaker*, 639 F.2d 516, 528 (9th Cir.1981), *cert denied*, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981); (Def.'s Resp. at 13). While the shares owned by one's spouse or children may be counted as one's own for purposes of being an insider, the above rules on trusts establish that the Jains are not the beneficial owners of the holdings of the trusts.

## II. Stock Transfers from the Trusts as Purchases

The term "purchase" is defined in Section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(13), to include "any contract to buy, purchase, or otherwise acquire." Questions often arise as to whether a particular transaction qualifies as a "purchase" or "sale" within the meaning of the statute. Courts have answered this question by applying essentially two types of analysis. For transactions which are ordinary (e.g. cash for stock) "purchases" or "sales," generally referred to as "orthodox" transactions, Section 16(b) has been strictly applied, using an "objective" analysis. *See Whittaker*, 639 F.2d at 522. Therefore, in an "orthodox" transaction, Plaintiff need not show any possibility for speculative abuse—it is presumed. For transactions which are not ordinary "purchases" or "sales," generally termed "unorthodox" or "borderline" transactions, courts have developed a "pragmatic" or "subjective" analysis to test whether the transaction is of the type that Congress sought to prohibit. *Id.* Plaintiff argues that all four stock transfers from the trusts to personal or escrow accounts are "purchases" under both the orthodox and unorthodox analysis. Defendants contend that the 1999 stock transfers from the trusts to the Jains' personal accounts were

not purchases because there was no possibility of speculative abuse. Even if an escrow was created, Defendants contend that transfer of shares from the NJGRAT trust to the escrow also created no possibility of speculative abuse, and therefore is not a purchase.

### A. Choosing the Analysis

There is no clear rule that the Court may apply in this case to determine whether to apply the orthodox or unorthodox test. *See Prager v. Sylvestri*, 449 F.Supp. 425, 430 n. 6 (S.D.N.Y.1978) ("The distinction between borderline or unorthodox transactions and garden-variety [or orthodox] ones is not overly bright."). It is clear to the Court, however, that the alleged purchases here are distinct from the archetypical case of stock-for-cash trades and appropriately categorized as borderline.

First, there was no obvious "purchase" in the sense of an exchange of stock for consideration. This lack of consideration may or may not be fatal to the argument that there was a purchase. As one commentator has noted.

> [C]ertain transactions involving no consideration are not a purchase or a sale under Section 16(b): Gifts, stock splits, stock dividends, and receipt of rights distributed to all stockholders pursuant to preemptive rights. Notwithstanding these Section 16(b) cases, transferring a security without receiving consideration could be a Section 16(b) purchase and sale under the proper circumstances. Whether or not a transfer for no consideration is a purchase and a sale, transfers for worthless consideration or inadequate consideration can be Section 16(b) purchases and sales.

Jacobs, *Disclosure & Remedies Under the Securities Laws* § 4:157 (2002). The fact that a transfer with no consideration may or may not be a violation of Section 16(b)

raises the considerations of the "unorthodox" analysis. Also, the Ninth Circuit has treated an "overissue" of stock—stock transferred in error—under the unorthodox analysis. *Kay v. Scientex Corp.,* 719 F.2d 1009, 1011–12 (9th Cir.1983). This is the closest case that the parties cite to the transaction at issue here, and the Court considers an erroneous overissue to be similar to the alleged erroneous transfers. Because not every allegedly erroneous transfer could be considered to be an orthodox transaction, it is appropriate to analyze the transactions at issue in this matter under the unorthodox rule.

### B. Unorthodox analysis

■ The Supreme Court has taught that the focus of the unorthodox test should be whether the transaction at issue threatens speculative abuse:

> Where alternative constructions of the terms of Section 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders. Thus, in interpreting the terms 'purchase' and 'sale,' courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse.

*Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 593, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). In considering whether the type of transaction at issue gives rise to the potential for speculative abuse, two factors are of primary importance: (1) access to inside information; and (2) the ability to influence the timing of a transaction. *Morales v. Gould Investors Trust,* 445 F.Supp. 1144, 1153 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1369 (2d Cir.1978).

Applying *Kern,* the Ninth Circuit has also emphasized that "involuntariness" is an important factor in determining wheth-

er or not a transaction constitutes a "sale" or "purchase" under Section 16(b). *Colan v. Mesa Petroleum Co.,* 951 F.2d 1512, 1522 (9th Cir.1991). The Supreme Court in *Kern* noted not just the lack of a possibility of speculative abuse, but also that the defendant—a company undergoing a merger—had no control over the stock transactions. The Ninth Circuit has effectively made involuntariness into a second requirement for passing the unorthodox test. "Absent a showing of involuntariness, we would not be justified in applying the Kern County rule." *Id.* The Ninth Circuit in *Kay* recited very strong language on voluntariness.

> In determining whether the overissuance of shares is a purchase within the meaning of section 16(b) we find it appropriate to inquire into the voluntary nature of the transaction. If an overissuance of stock is done *entirely without participation* by the recipient of the stock it is doubtful the transaction presents the opportunity for speculative abuse condemned by section 16(b). If, however, the recipient is *instrumental in the overissuance,* the opportunity for speculative abuse is present.

719 F.2d 1009, 1013 (emphasis added). Other courts have also applied extremely narrow definitions of voluntariness: "Case law establishes a stiff test of voluntariness. So long as the seller retains *any degree of control* over a transaction, its actions will not be found to be involuntary." *Sprague Elec. Co. v. Mostek Corp.,* 488 F.Supp. 842, 845 (N.D.Tex.1980) (emphasis added). Accordingly, the Court evaluates whether the Jains' transactions were neither voluntary nor likely to lead to speculative abuse.

### 1. Voluntariness

The Jain Defendants' actions were voluntary. The Jains signed papers allowing transfer of funds from the GRATs. The Jains caused deposits of trust stock into their personal brokerage accounts by forwarding stock certificates to their personal broker. Mr. Jain promised to place shares of the NJGRAT trust into escrow to fulfill a personal obligation. The fact that the Jains failed to read their brokerage statements, simply signed legal documents without knowing what they were, and mistakenly sent certificates to their personal broker does not make their actions involuntary. As noted above, their subjective intention is not relevant to a Rule 16(b) analysis. The Jain Defendants are correct that their actions are "less voluntary" than those in the *Kay* overissue case. *See* 719 F.2d at 1013. Nonetheless, the Jains participated in the transfers and retained more than a degree of control over the transactions. Without the participation of the Jains, the transfers would not have happened. While the Jains' actions in effecting the transfers may not have been culpable, they were voluntary.

### 2. Possibility of Speculative Abuse

The Jains' transfer of shares to their personal accounts created the possibility of speculative abuse. The Jains had insider knowledge and influence over the timing of the transfers. Again, it does not matter what the Jains intended or what speculative actions they actually took. Rather, it is clear that the transfer of literally millions of shares to a personal account created the possibility of speculative abuse. The Jains could have sold the shares at a high price, repurchased the shares at a lower price, and then transferred the shares back to the trusts. The transfers created the possibility of selling, or "freeing up" for sale, the Jains' personal shares. The *Kay* court found as a matter of law that acquisition through an erroneous overissuance and consequent sale for cash demonstrated the possibility of speculative abuse: "When insiders participate in voluntary acquisitions of stock coupled with conventional sales, the possibility of specu-

lative abuse of insider information is present. Neither proof of actual abuse of insider information nor proof of intent to profit on the basis of such information is necessary under section 16(b)." 719 F.2d at 1013. Plaintiff demonstrates both voluntariness and the possibility of speculative abuse.

### C. Gifting

■ Defendants argue that the transfers may be characterized as gifts. Bona fide gifts are exempted from Section 16(b). Rule 16b–5 ("Both the acquisition and the disposition of equity securities shall be exempt from the operation of Section 16(b) of the [Exchange] Act if they are bona fide gifts."). Gifts are not sales or purchases when made in good faith and without subterfuge. See Shaw v. Dreyfus, 172 F.2d 140, 142–43 (2d Cir.1949), cert. denied, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949).

There is no evidence that the trusts gifted the shares, or had the authority to gift the shares, to the Jain Defendants. There is no evidence that the Jain Defendants had the power or authority to gift the trust shares to themselves. An allegedly erroneous transfer cannot be reclassified as a gift to escape liability for short-swing trades.

Because the Jains' transfers of stock in 1999 from the NJGRAT, AJGRAT, and Family trust were voluntary and created the possibility of speculative abuse, they constitute purchases for purposes of Section 16(b) liability. Mr. Jain's placement of NJGRAT shares into an escrow account also was voluntary and created the possibility for speculative abuse, and therefore it is a purchase.

### III. Existence of the Escrow Account

■ Defendants insist that the escrow account of the one million InfoSpace shares from the NJGRAT was never in fact established. Plaintiff argues that the SEC filings and actions of the parties demonstrate the existence of the escrow.

On December 11, 1998, Mr. Jain and InfoSpace executed an indemnification agreement to establish the escrow fund at issue. (Spoonemore Decl. Ex. 23 at 1, 4.) That same day, Mr. Jain was to deliver "to the Escrow Agent certificates representing 1,000,000 shares of the Company's Common Stock . . ." (Id. at 4.) The agreement appointed InfoSpace as the escrow agent. (Id. at 9.) The agreement stated that Mr. Jain was to have the right to vote the escrowed stock and receive cash dividends, while the escrow agent had the right to possess the escrowed stock. (Id. at 4.)

The agreement is governed by Washington law. (Id. at 10.) In Washington, an escrow is defined as a transaction:

wherein any person or persons, for the purpose of effecting and closing the sale, purchase, exchange, transfer, encumbrance, or lease of real or personal property to another person or persons, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition or conditions, when it is then to be delivered by such third person, in compliance with instructions under which he or she is to act, to a grantee, grantor, promisee, promisor, obligee, obligor, lessee, lessor, bailee, bailor, or any agent or employee thereof.

RCW 18.44.011(4). The escrow agreement between Mr. Jain and InfoSpace reflects the encumbrance and transfer of the personal property of one million shares. The escrow provisions of the agreement did not specify which third person was to hold the stock certificates or where the certificate

would be held. The Court does not find it unusual, however, that the attorneys for InfoSpace, PerkinsCoie, would hold the certificates. *See FDIC v. Knostman,* 966 F.2d 1133, 1140 (7th Cir.1992). Neither does the failure to identify a third party nor the fact that PerkinsCoie already had possession of the certificates at the time of the agreement's execution prevent formation of the escrow. *See id.* at 1140–41. It is clear that the parties intended and agreed to encumber the personal property and establish an escrow. *Cf.* Stoebuck, 17 *Wash. Prac., Real Estate: Property Law* § 7.11 ("delivery" means "intent." It is possible, and Washington has so held, "for a deed to be delivered though it remains in the grantor's possession, provided his intent that it shall pass title is clearly shown.") The terms of the escrow are not in dispute. Mr. Jain and InfoSpace, with the assistance of PerkinsCoie, represented to the SEC that the NJGRAT shares were placed into escrow. It is undisputed that PerkinsCoie held the certificates when Mr. Jain and InfoSpace signed the agreement. These actions formed an escrow.

Additionally, the Court agrees with Plaintiff that Mr. Jain's pledge of NJGRAT shares created the possibility of speculative abuse. Through the pledge of the NJGRAT shares, Mr. Jain avoided pledging stock he already owned, thereby gaining an opportunity to trade a million shares that otherwise would have been encumbered. Mr. Jain incurred no risk that the one million shares from the NJGRAT would decrease in value, since he did not pay for the shares on their transfer. Because Mr. Jain placed in escrow one million shares of the NJGRAT, he effected a purchase for purposes of liability under Section 16(b).

#### IV. *Motion to Strike Expert Report*

Plaintiff moves to strike Defendant's expert report. Defendants' expert report on securities law does not assist the Court in resolving the cross-motions. Accordingly, Plaintiff's motion to strike is DENIED as MOOT.

### CONCLUSION

Because the transfers at issue in this matter are purchases for purposes of determining short-swing trades, Plaintiff's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.

### ORDER DENYING DEFENDANTS' MOTIONS FOR RECONSIDERATION

This matter comes before the Court on Defendants' motions for reconsideration. Defendant Naveen Jain moves for reconsideration of this Court's order on summary judgment, (Dkt. No. 157), as do the Jain Trusts and Anuradha Jain, (Dkt. No. 159). Defendants contend that the Court erred in concluding that Defendants are liable under Section 16(b) for trust transactions because: (1) the trustee can rescind the stock transfers and therefore avoid Section 16(b) liability; and (2) no escrow was created. The Jain Trusts also move for a Rule 56(f) continuance to conduct discovery to support an additional motion for reconsideration, which would be filed after the ten day deadline for reconsideration motions. (Dkt. No. 152.)

Motions for reconsideration are disfavored. Local Rule CR 7(h)(1). The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence. *Id.* The Court disagrees with Defendants' contentions of manifest error, and accordingly Defendants motions for reconsideration are DENIED. Because Defendant has failed to demonstrate grounds for a late Rule 56(f)

continuance, Defendants' motion is DE-NIED.

## I. Rescission

Defendants argue that the trustee can rescind any transfers from the trusts to the Jains on the grounds that such transfers were invalid because the trustee never approved them. Rescission, Defendants argue, eliminates Section 16(b) liability.

First, this is an inappropriate new argument, and Defendants have failed to show why this issue could not have been raised on the cross-motions for summary judgment. *Rosenfeld v. United States Dep't of Justice*, 57 F.3d 803, 811 (9th Cir.1995). The fact that Defendants hired new counsel after losing on summary judgment is not by itself justification for raising new issues on reconsideration and effectively relitigating the prior order.

Second, the Court does not agree on the existence of a broad rule eliminating invalid, later rescinded transactions from Section 16(b) liability. *See Oliff v. Exchange Int'l Corp.*, 449 F.Supp. 1277, 1291 (N.D.Ill.1978) ("The issue is thus not whether a rescission took place but whether the particular rescission constituted a purchase within the meaning of section 16(b)."). If Section 16(b) liability could be avoided by rescission, then all potential defendants in such actions could simply rescind in the face of a lawsuit. The mere fact that a transfer is invalid does not insulate a person from Section 16(b) liability. *See Kay v. Scientex Corp.*, 719 F.2d 1009, 1013–14 (9th Cir.1983). The cases that Defendants cite are very narrow exceptions where courts found that rescission demonstrated that there was, in fact, no transaction and no threat of speculative abuse. *See Oliff*, 449 F.Supp. at 1291–93 (analyzing cases on rescission). Here, in contrast, Plaintiff demonstrated the possibility of speculative abuse.

## II. Escrow

Defendant Naveen Jain contends that there is at least a fact issue regarding whether or not an escrow exists. In its Order on the cross-motions for summary judgment, the Court considered the evidence presented by Defendant and concluded that it demonstrated the existence of an escrow. Defendant makes two principle arguments on the escrow issue: (1) that Perkins Coie did not agree to be an escrow agent; and (2) that the SEC filings contained contradictory information supporting the inference that no escrow was created.

Having examined the original briefing on the escrow issue, again the Court finds that both arguments Defendant raises on reconsideration to be new, and therefore inappropriately raised. *Rosenfeld*, 57 F.3d at 811. Nonetheless, the Court does not agree with Defendant's contentions. Defendant argues that Perkins Coie had to agree to be an "escrow agent" to the transaction in order for the escrow to exist, but cites a 1973 District of Columbia Court of Appeals case for the proposition. (Jain Recon. at 2.) Regardless, the terms of the escrow agreement name InfoSpace as the escrow agent. InfoSpace's counsel, Perkins Coie, had possession of the shares and clearly knew of the agreement. The Court found these undisputed facts sufficient for establishing the existence of an escrow.

Defendant also contends that SEC filings are contradictory. In several cases the filings indicate that Mr. Jain "has agreed" to escrow "beneficially owned" shares, whereas in another the filing states that Mr. Jain had established the escrow with trust shares. The Court does not believe that these differences create an issue of fact. The actions of the parties demonstrate the existence of the escrow. Defendant's motion for reconsideration is DENIED.

### III. Rule 56(f) Continuance

The Jain Trust Defendants seek a Rule 56(f) continuance in order to discover information regarding the formation of an escrow and transfer of trust assets. On obtaining this information, Defendants seek to file an additional motion for reconsideration past the ten day deadline.

A Rule 56(f) motion must be brought before the summary judgment hearing. *United States v. Kitsap Physicians Service,* 314 F.3d 995, 1000 (9th Cir.2002), *citing Ashton–Tate Corp. v. Ross,* 916 F.2d 516, 520 (9th Cir.1990). While other jurisdiction may have recognized exceptions to this rule, Defendants have failed to demonstrate why any exception should apply here.

Although Defendants contend that the Court made an "unexpected finding" regarding the existence of the escrow, and in particular concerning the actions of Perkins Coie, these issues were argued and briefed by the parties. (*See,* e.g., Pl.'s Mot. Summ. J. at 12) ("Perkins Coie certainly knew that those shares were subject to escrow—it was the very entity that, in drafting the public filings, inserted the statements that the NJGRAT shares had been placed into escrow."). The existence of the escrow was a critical issue on summary judgment, and the Court agreed with the arguments advanced by Plaintiff. Moreover, the parties engaged in significant discovery for nearly a year before submitting cross-motions for summary judgment to the Court. The briefs on the cross-motions for summary judgment were submitted, by stipulation of the parties and order of the Court, past the deadline for dispositive motions. The Court extended the deadline after the parties represented that they expected no trial would be necessary and that the case could be resolved as a matter of law. Defendants' change of attorneys is not grounds for a continuation.

Having failed to show manifest error to the Court, Defendants motions for reconsideration are DENIED. Because Defendant has failed to demonstrate grounds for a late Rule 56(f) continuance, Defendants' motion is DENIED.